**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**AARON E. CAILLOUET, TRUSTEE**                           **CIVIL ACTION**

**VERSUS**                                                **NO: 06-9052**

**FIRST BANK AND TRUST**                                  **SECTION: "K"(2)**
*Pertains to: In Re Entringer Bakeries, Inc.* (Bankruptcy No. 01-14388)


**<u>ORDER AND REASONS</u>**


       Before the Court is an Appeal and Cross-Appeal from bankruptcy court heard pursuant to

the Court's authority over bankruptcy appellate proceedings under 28 U.S.C. § 158(a). After

reviewing the record, pleadings, memoranda, and relevant law, the Court hereby affirms the

decision of the bankruptcy court.

1

# I. BACKGROUND

## A.     Facts

The Bankruptcy Judge summarized the relevant facts as follows:

> On September 29, 2000, the Debtor borrowed $180,000 from the Defendant as evidenced by a promissory note of even date ("the First Note"). The Debtor has no prior lending relationship with the Defendant prior to that date. The loan was in the nature of a bridge loan, that is, both the Debtor and the Defendant contemplated permanent financing to occur prior to the note's maturity. The First Note was unsecured and became due in three months; interest was due monthly.
>
> In furtherance of its desire for permanent financing, the Debtor applied for a loan ("Whitney Loan") from Whitney to be guaranteed ("SBA Guaranty") by the Small Business Administration ("SBA"). The necessary documentation was submitted on November 17, 2000, and, on December 12, 2000, the SBA approved the request that it guarantee the Debtor's obligation under the Whitney Loan.
>
> As the closing of the Whitney Loan could not occur prior to the maturity of the First Note, the Debtor executed a renewal promissory note on January 30, 2001 ("the Second Note"). The Second Note called for one interest payment to be made on March 5, 2001, with the principal an additional accrued interest being due on March 30, 2001....
>
> ....
>
> The Credit Memorandum of Gary Lorio dated November 3, 2000 ("Lorio Memo"), sets forth that Whitney intended that the Debtor's indebtedness to First Bank, along with $525,000.00 of the Debtor's existing unsecured debt to Whitney, would be repaid with the Whitney Loan "proceeds combined with the RLC term loan of $500.000.00."
>
> Another condition of the SBA Guaranty was that the Whitney Loan was to be secured by the Debtor's fixtures located at 3847 Desire Parkway, New Orleans, LA 70139, certain machinery and equipment, and the Debtor's leasehold interest.
>
> The one time interest payment of $1,203.00 required by the Second Note was paid by the Debtor to the Defendant by its check

2

number 2920 dated March 6, 2001. That check cleared on March 9, 2001. The check was drawn on the Debtor's Operating Account.

The SBA-guaranteed Whitney Loan closed on April 6, 2001; on April 12, 2001, $900,000.00 was deposited into Debtor's Business Checking Account. On the same day $250,000.00 was deposited into the Debtor's Business Checking Account by RLC. At the time these deposits were made, the Debtor's Business Checking Account has an existing balance of $73,298.62.

During the month of April, 2001, the Business Checking Account reflected deposits and credits in the amount of $1,935,897.82 and checks and debits in the amount of $1,956,714.49.

On April 12, 2001, two "Debit Memos" were entered in the Debtor's Business Checking Account whereby Whitney repaid outstanding unsecured indebtedness owed to it by the Debtor in the total amount of $725,000.00 ($525,000.00 and $200,000.00).

When the Whitney Loan funds were disbursed to the Debtor, the Debtor had complete physical control over the money remaining in the account after repayment by it of the outstanding Whitney unsecured indebtedness, namely, $725,000.00. Also, once the money was loaned to the Debtor, Whitney considered the Whitney Loan proceeds to be property of the Debtor.

In making the Whitney Loan to the Debtor, Whitney did not obtain an assignment of the Defendant's claims against the Debtor nor did Whitney substitute itself in the place of the Defendant.

By check number 1404 out of the Business Checking Account, dated April 13, 2001, the Debtor paid the Defendant $181,702.50, representing the principal and accrued interest on the Second note, and charges owed on the Second Note. Check 1404 cleared on April 16,2001. Both the First Note and the Second Note bear stamps stating "PAID April 17, 2001."

*See* Notice of Appeal, Reasons for Decision, at p. 21 (Rec.Doc.No. 1).

**B.   *Procedural Posture***

On May 29, 2001, Entringer Bakeries, Inc. ("Entringer" or "Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The proceeding was converted to a case under Chapter 7, and Aaron E. Callouet was duly appointed as trustee ("Trustee"). Acting on behalf of the creditors of Debtor, Trustee filed a Complaint asserting two causes of action against First Bank and Trust ("First Bank").

Only one of the causes of action remains viable.[1] In this action, Trustee sought to avoid certain preferential transfers to First Bank, as initial transferee, under section 550 of the Bankruptcy Code.[2] Specifically, the Chapter 7 Trustee seeks to recover the pre-petition payments of $1,203.00 and $181,702.50 made on March 6, 2001, and April 13, 2001, respectively.

Defendant contends that $181,702.50 was never property of the Debtor's estate, and therefore, Trustee could not avoid the transactions as preferential transfers. Alternatively, Defendant argues that the transactions were made in the ordinary course of business in accordance with section 547(c)(2) of the Bankruptcy Code, and thus, are excepted from the bar on preferences.

The Honorable Judge Schiff, U.S. Bankruptcy Judge, held the following:

> [T]he transfers made by the Debtor to the Defendant on March 6, 2001, in the amount of $1,200.00, and on April 13, 2001, in the amount of $181,702.50, can be avoided by the Trustee as being preferential transfers pursuant to section 547(b) only in the amount of $74,281.04; further the Defendant was an initial transferee, the

---

[1] A consent judgment was entered in favor of the Trustee and against First Bank in an amount totaling $10, 989.94.

[2] Section 550 allows the trustee to recover, "for the benefit of th estate, the property transferred, or, if the court so orders, the value of such property, from...the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a).

4

amount of $74,381.04[3] can be recovered by the Trustee from the
Defendant pursuant to section 550(a).

*See* Notice of Appeal, Reasons for Decision, at p. 21 (Rec.Doc.No. 1).


## II. STANDARD OF REVIEW


Pursuant to § 158 of Title 28 of the United States Code, this Court has jurisdiction to hear

this appeal from the final judgments, orders and decrees of the Bankruptcy Court. As such, the

Court may affirm, modify or reverse a bankruptcy court's judgment, order or decree or remand

with instructions for further proceedings. Findings of fact, whether based on oral or documentary

evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the

opportunity of the bankruptcy court to judge the credibility of the witnesses. Bankr. R. 8013;

*Matter of Killebrew,* 888 F.2d 1516, 1519 (5th Cir. 1989). The legal conclusions are subject to *de

novo* review. *Matter of Kennard,* 970 F.2d 455 (5th Cir. 1991); *see also Crescent City

Liquidation Trust v. Mirage Resorts, Inc.*, 2002 WL 1046709, *1 (E.D. La. May 20, 2002)

(Duval, J.).

---

[3] The bankruptcy court found that the estate was diminished by $74,381.04, which was
the net proceeds obtained in a forced sale of certain collateral. This valuation is further discussed
below, as it is an issue before the Court in the instant appeal.

# III. ANALYSIS

## A.    *Preferences*

If the Court finds that the transfers made to the Defendant were preferences under the Bankruptcy Code, then, unless the transfer falls within a recognized statutory or jurisprudential exception, the Trustee is entitled to bring an action against the preferred creditor to recover funds improperly diminishing the debtor's estate. *See* 11 U.S.C. § 547(b).

Generally, a trustee has the authority to avoid certain transfers of a debtor's interest in property as an illegal preference, if the property was transferred:

> (1)    to or for the benefit of a creditor;
> (2)    for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3)    made while the debtor was insolvent;
> (4)    made -
>> (A)    on or within 90 days before the date of filing of the petition; or
>> (B)    between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5)    that enables such creditor to receive more than such creditor would receive if –
>> (A)    the case were a case under chapter 7 of this title;
>> (B)    the transfer had not been made; and
>> (C)    such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The parties have stipulated that elements (1) - (5) are satisfied; thus, the Court's inquiry concerns a threshold dispute as to whether the Debtor had an interest in the transferred funds.

The phrase "transfer of an interest of the debtor in property" in section 547(b) is not expressly defined by the Bankruptcy Code, but it is well-established that it is broadly defined,[4] and guidance is to be drawn from the definition of "property of the estate" set forth in section 541(a). *Begier v. IRS,* 496 U.S. 53, 58-59 (1990); *Bailey v. Hazen (In re Ogden),* 243 B.R. 104, 112-13 (10th Cir. BAP 2000) (relying on *Payne v. Clarendon Nat'l Ins. (In re Sunset Sales, Inc.),* 220 B.R. 1005, 1013 (10th Cir. BAP 1998), *aff'd* 195 F.3d 568 (10th Cir. 1999)).

"Section 541(a)(1) provides that the property of the estates includes all legal or equitable interests of the debtor in property as of commencement of the case." *Begier*, 496 U.S. at 59 (quotations omitted). In contrasting legal and equitable interests in property, Section 541(d) states:

> Property in which the debtor holds, as of commencement of the case, only legal title and not an equitable interest...becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). Thus, section 541(d) excludes from the property of the estate that which the debtor holds in trust for another. *See Begier*, 496 U.S. at 59.

"This section does not, however, create or define property interests. Therefore, in the absence of controlling federal bankruptcy law, the substantive nature of property rights is defined by reference to state law." *In re Oxford Management, Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993).

---

[4] Such a broad definition is consistent with the general policy of prohibiting preferential transfers so that (1) creditors are discouraged "from racing to the courthouse to dismember the debtor during his slide into bankruptcy, and (2) facilitating the prime bankruptcy policy of equality of distribution among creditors of the debtor." *Matter of Criswell*, 102 F.3d 1411, 1414 (5th Cir. 1997)(*citing* H.R. Rep. No. 596, 95th Cong., 1st Sess., at 177-78 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6138).

**B.      *Earmark Doctrine***

The earmarking doctrine stands as a judicially created equitable exception to the rule

prohibiting preferential transfers of the debtor's property.  The exception is described as follows:

> Under the "earmarking doctrine," funds provided to a debtor for the
> purpose of paying a specific indebtedness may not be recoverable as
> a preference from the creditor to which they are paid, on the premise
> that the property "transferred" in such a situation was never property
> of the debtor and so the transfer did not disadvantage other creditors.
> One creditor has been substituted for another thus, when new funds
> are provided by the new creditor to or for the benefit of the debtor for
> the purpose of paying the obligation owed to the old creditor, the
> funds are said to be "earmarked" and the payment is held not to be a
> voidable preference.

5 COLLIER ON BANKRUPTCY  ¶547.03[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev),

p. 547-24.

In applying the "earmarking doctrine," the Fifth Circuit has held the determinative factor as

to whether the property is part of the debtor's estate is whether the debtor has dispositive control

over the property. *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351 (5th Cir. 1986);

*Matter of Southmark Corp.*, 49 F.3d 1111 (5th Cir. 1995).

Despite acknowledging that Fifth Circuit's "control" test, the bankruptcy court applied an

Eighth Circuit test, which stated that funds would be considered earmarked, and therefore, not

part of the debtor's estate if the following was shown: (1) the existence of an agreement between

the new lender and the debtor that the new funds will be used to pay a specific antecedent debt;

(2) performance of that agreement according to its terms; and (3) the transaction viewed as a

whole did not result in any diminution of the estate. *In re Entringer Bakeries, Inc.*, 347 B.R. 550,

555 -556 (Bkrtcy. E.D. La. 2006) (*citing In re Bohlen Enterprises, Ltd.,* 859 F.2d 561 (8th Cir.

8

1988)).

The *In re Bohlen* court did acknowledge the "control" test, and in fact, noted that the outcome in the case would be the same under such a test. The *In re Bohlen* court held that the funds at issue were not earmarked because the second element had not been satisfied, i.e. performance of the agreement according to its terms. The Eighth Circuit further noted that "[e]ven if we apply the frequently invoked test of whether the debtor had 'control' over the funds provided by the new lender, the instant facts nevertheless require a holding that a voidable preference has occurred." *In re Bohlen Enterprises*, 859 F.2d at 567.

The Trustee contended during oral argument that the bankruptcy court erred in applying the Eighth Circuit test, and the Court must look to Louisiana law to determine whether the disputed transfers involved property of the estate. While this argument certainly has some merit, the Trustee did not reconcile this position with the Fifth Circuit law regarding the earmark doctrine. That is, the Fifth Circuit has consistently applied the "control" test to determine whether certain transfers involve property of the debtor's estate, and has not merely ascertained the extent of debtor's interest in the property under state law.[5] *See Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351 (5th Cir. 1986); *In re Jazzland, Inc.*, 2006 WL 151907 (5th Cir. 2006) ; *In re Searex Energy Serv., Inc.*, 131 Fed.Appx. 449 (5th Cir. 2005); *but see In re Oxford Management, Inc.*, 4 F.3d 1329 (5th Cir. 1993) (court determined that because Louisiana law does not recognize constructive trusts, funds that were held by debtor for commissioned agents was property of debtor's estate absent formal creation of trust).

---

[5] The Fifth Circuit has recognized that "[t]he earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim." *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1356 (5th Cir. 1986).

Indeed, the Fifth Circuit's "control" test can potentially reclassify what would typically constitute property of the debtor's estate under section 547(b), which defers to state law, in that, property over which the debtor has no dispositive control is not considered property of the estate, though the debtor may theoretically own, physically possess, or otherwise have an equitable interest in the property for some brief period of time during which preferential transfers would otherwise be avoidable by the trustee.

Courts have criticized this jurisprudential narrowing of what would otherwise constitute property of the debtor's estate under section 547(b). *See In re Moses*, 256 B.R. 641, 646 (10th Cir. 2000)(*quoting In re Bohlen Enterprises, Ltd.*, 859 F.2d 561 (8th Cir. 1988). Furthermore, courts have criticized the "control" test as being largely conclusory. David B. Young, *Preferences and Fraudulent Transfers, in* 895 COMMERCIAL LAW AND PRACTICE HANDBOOK SERIES 713 (Practicing Law Institute, April 2007)(*citing In re Libby Intern, Inc.*, 240 B.R. 375, 379 (Bankr. W.D. Mo. 1999) ("control" test not dispositive because primary inquiry is whether there is diminishment of the debtor's estate as a result of the transaction)).

Of course, the divergence in the application of earmarking doctrine from what is contemplated in the Bankruptcy Code as the debtor's property manifests only in the extension of the doctrine beyond the co-debtor/guarantor/surety context or where there is a solemn purchase of the debtor's promise to pay.[6] In these situations, the fact that the property passes through the

---

[6] Although a debtor may have legal title to certain property, the Bankruptcy Code excludes such property from the bankruptcy estate to the extent that the debtor does not have an equitable interest in that property. 11 U.S.C. § 541(d). This provision provides the codal basis for discounting from the debtor's estate that property which the debtor holds in trust for another. *See Begier*, 496 U.S. at 59. This provision, however, does not resolve the inconsistency of the earmarking doctrine and the Code's contemplation of the debtor's property unless the property passes through a trust account of the debtor. For example, in *In re Jazzland* and *In re Searex* (see

debtors hands or goes directly to the new creditor does not affect the ownership of the property, as it is not classically understood as being part of the debtor's estate.

On the other hand, the equitable extension of the earmarking doctrine seems warranted in certain circumstances. For example, in *Coral Petroleum*, the Fifth Circuit held that certain funds were not property of the estate because the debtor had no dispositive control over the funds, though it had some theoretical control of the funds at some "magic moment" due to a simultaneous credit and debit of its account.[7] Thus, the nature of the transaction is such that the parties involved understand and intend that the debtor is merely substituting one creditor for

_____

below), the funds did not pass through a fiduciary account of the debtor. Rather, the funds were initially held in fiduciary accounts and disbursed to the debtor with no formal restriction other than the charge to use the funds to pay the creditor. In other words, the funds were not in the hands of the debtor as a fiduciary, but rather, as a mere obligor. Thus, section 541(d) would not justify the exclusion of these funds from the bankruptcy estate, despite the fact that they were initially segregated in a fiduciary account.

[7]   Coral (debtor) was loaned $35,000,000 from Paribas-Suisse. Leeward, an indirect subsidiary of Coral, deposited $35,000,000 with Paribas-Suisse to serve as pledged collateral for Paribas-Suisse's loan to Coral. Paribas-Suisse thereafter placed a fiduciary deposit of this amount in its own name at Paribas-London to avoid certain taxes, and Paribas-Suisse retained control of the funds at all times with respect to Coral and Leeward. On January 14, 1983, this pledge agreement was memorialized in a "General Form of Pledge Agreement" that gave Paribas-Suisse a right of pledge and offset on any Leeward deposit against any claims Paribas-Suisse might have against the debtor.

Coral had decided to prepay the note, and also informed Leeward of this fact. On the same day, Leeward instructed Paribas-Suisse to break its $35,000,000 fiduciary deposit at Paribas-London and to transfer this sum to Leeward's Paribas-Suisse account in Geneva. A few minutes thereafter, Leeward instructed Paribas-Suisse to transfer the $35,000,000 from Leeward's Paribas-Suisse account in Geneva into Coral's account at Paribas-Suisse in Geneva. Also on May 9, 1983, Coral telexed Paribas-Suisse directing that the incoming $35,000,000 be applied to repay its loan obligation to Paribas-Suisse. In this simultaneous bookkeeping transaction in accordance with these instructions, Coral paid off the original $35,000,000 loan.

The Fifth Circuit held that despite the funds being deposited in Coral's account for a brief period of time, the 35,000,000 was not part of the debtor's estate because Coral had no dispositive control over these funds.

another, as opposed to the debtor's mere unilateral extinguishment of one old obligation and creation of new identical obligation. While evidence of the debtor's lack of control over the property can circumstantially show that the former situation occurred, proof of the lack of the debtor's control does not necessarily show whether the property is part of the debtor's estate or the nature of the transaction.

The Court views the extended application of the earmarking doctrine equitable in character and grounded in the policy expressed by the Bankruptcy Code. If the estate is not diminished as a practical matter, then there is no preference. Although for all intents and purposes the debtor is merely a conduit for the property, it is clear that funds so earmarked are theoretically part of the debtor's estate. Such an extension is justifiable, however, given that the property most likely would never have been part of the debtor's estate unless the parties to the transaction desired a substitution of creditors as to a particular obligation of the debtor.

Nevertheless, the Fifth Circuit has explained that property cannot not be considered earmarked when the debtor has absolute or unfettered control over the funds. *Coral Petroleum*, 797 F.2d at 1362 n. 12.; *see also Matter of Southmark Corp.*, 49 F.3d 1111 (5th Cir. 1995). Here, the parties stipulate that the Debtor has absolute physical control over the funds as they were deposited in Debtor's Business Checking Account. As noted by the bankruptcy court, legal title, in and of itself, does not make the funds part of the estate:

> Where the debtor physically receives control of the funds, there can still be an "earmark," but the debtor's lack of dispositive control must be proven. Demonstrating the *third party's-intent* is one way of doing this, but [the Fifth Circuit does] not believe it is the exclusive method, especially if there is adequate proof of the lack of control by a debtor. (citations omitted).

*Coral Petroleum*, 797 F.2d at 1361.

Two recent Fifth Circuit opinions have applied the "control" test, though these opinions are unpublished. *In re Jazzland, Inc.*, 2006 WL 151907 (5th Cir. 2006) ; *In re Searex Energy Serv., Inc.*, 131 Fed. Appx. 449 (5th Cir. 2005). In *Jazzland*, the Court held that although the funds under dispute, initially disbursed from a retainage account, merely "passed through" the debtor's hands, the "[debtor] had no interest in the retainage at the time it petitioned for bankruptcy and these funds were properly excluded from the estate." *Jazzland*, 2006 WL 151907, at *1. Similarly, in *Searex*, the Fifth Circuit held that despite the marine building project funds' passage through debtor's account, "the funds used to make payments to [creditor] were not within the control of the debtor and therefore were not owned by the debtor at the time of the transfer." *Searex*, 131 Fed. Appx. at 449.

The Trustee distinguished these Fifth Circuit cases saying that the funds at issue had been segregated in types of fiduciary accounts, i.e., a retainage account and an escrow account. Citing *Oxford Management*, the Trustee further argued that because Louisiana does not recognize constructive trusts, the funds held in Debtor's general operating account must be considered part of the bankruptcy estate. In *Oxford Management*, the Fifth Circuit held that because Louisiana does not recognize constructive trusts, funds were not earmarked for associate brokers, despite the bankruptcy code's recognition that property ostensibly owned by a debtor may not be the property of the debtor's estate. 4 F.3d at 1335.

The bankruptcy court highlighted the following evidence to support its conclusion that the funds disbursed from Whitney had been earmarked for First Bank:

> 1.    The "Transaction Request" of the November 3, 2000, Credit Memorandum of Gary Lorio, a Senior Vice-President at Whitney, to Whitney's Senior Loan Committee states, "The term loan proceeds combined with the RLC term loan of

13

$500M will be used to repay existing Whitney unsecured debt of $525M and a $180M loan from First Bank." *See* Joint Exhibit 17.

2.  The deposition testimony of Mr. Lorio in which he testified that he told Mr. Ballero, an employee of [First Bank], that the First Note would be paid when the Whitney Loan was funded. Moreover, he said that "it was our discussion with borrower, the borrower is Mr. Leunissen and First Bank, that they would use those portions of the proceeds or that difference to pay off the loan at First Bank." *See* Joint Exhibit 39, p. 58.

3.  Mr. Lorio testified that there was no specific reason why the funds were not directly disbursed to First Bank, but that there was common understanding among Mr. Leunissen, First Bank, and Whitney, that the funds would be used to pay off First Bank. *See* Joint Exhibit 39, p. 49.

*In re Entringer*, 347 B.R. at 557.

Notably, it is clear that all parties to the transaction understood that a portion of the Whitney loan proceeds were to be used to pay off First Bank. Thus, Court finds that what was intended by the parties was a substitution of Whitney for First Bank as creditor with respect to the obligation to pay a certain loan. Moreover, it is clear that the debtor did not have dispositive control over the property and the funds merely passed through the debtor's hands despite the fact that Entringer was ostensibly the owner of the funds for a slice of time. The Court, therefore, finds that the bankruptcy court correctly applied the equitable earmarking doctrine in finding that the transaction was not an avoidable preference.

**C.   *Diminishment of the Debtor's Estate***

The second question before the Court is whether the bankruptcy court erred in holding that the dimunition of the debtor's estate was $74,381.04. One justification for applying the earmarking doctrine is that there is no diminution of the debtor's estate. As the Fifth Circuit noted,

> [t]he primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought judgment.

*In re Southmark Corp.*, 49 F.3d at 1117.

When a secured creditor takes the place of an unsecured creditor, despite the fact that the funds passing through the debtor's hands are excluded from the bankruptcy estate, the estate is diminished by the value of the collateral given to secure the loan. *See In re Hartley*, 825 F.2d 1067, 1071 (6th Cir. 1987). Citing *In re Hartley* for the proposition that such a transaction is voidable only to the extent that the debtor's estate is diminished, the bankruptcy court held that Entringer's estate was diminished by the collateral given as security for the loan.[8] It is clear that the Whitney loan would not have been made, and Debtor's obligation to First Bank would not have been satisfied, absent the Debtor's granting of a security interest in favor of Whitney. *See In re Hartley*, 825 F.2d at 1071. Thus, the Court finds, as did the bankruptcy court, that the Debtor's estate was diminished by the value of the collateral given to secure the Whitney loan.

**D.     *Valuation***

---

[8] Entringer granted Whitney a security interest in fixtures located on its property, certain machinery and equipment, and a leasehold interest. *See* Joint Pre-trial Stipulation, p. 7.

The standard for valuation of collateral was articulated by the bankruptcy court as follows:

> A liquidation analysis is used to determine "fair valuation" of assets where the debtor is "financially dead or mortally wounded." *E.g., Langham, Langston & Burnett v. Blanchard,* 246 F.2d 529, 532-33 (5th Cir.1957). Liquidation or scrap value of assets must be used because, if the entity is not a going concern at the time of the transfer, "it would not be proper for the assets to be valued at a going concern value." *Id.* (citation omitted); *Mitchell v. Investment Secs. Corp.,* 67 F.2d 669, 671 (5th Cir. 1933) (stating that use of scrap or junk values is proper if the debtor, though nominally alive, is really dead on its feet on the date of the transfer).
>
> If bankruptcy was not clearly imminent on the date of the challenged transfer, the court must achieve a "fair valuation" of the debtor's assets on a "going concern" basis. *In re Trans World Airlines, Inc.,* 134 F.3d 188 (3rd Cir.1998); see also *WCC Holding Corp. v. Texas Commerce Bank-Houston,* 171 B.R. 972, 984 (Bankr. N.D. Tex.1994) (*citing Moody v. Security Pac. Business Credit Inc.,* 971 F.2d 1056, 1067 (3rd Cir.1992)).

*In re Entringer*, 347 B.R. at 558.

Finding that the bankruptcy was clearly imminent and the Debtor was "financially dead or mortally wounded," the bankruptcy court held that the value of the collateral at the time of its transfer to Whitney was $74, 381.04,[9] which was the price the collateral sold for in November 2001 and January 2002, in a forced liquidation sale.[10] *See In re Entringer*, 347 B.R. at 558.

In support of this finding the bankruptcy court noted the testimony of Mr. Leunissen, owner of the Debtor, who said the business was "limping along, but operating." He also testified that "[i]t was a month-to-month struggle trying to repay the debt. We were-We had a cash crisis

---

[9] *See In re Love*, 155 B.R. 225, 231 (Bkrtcy. D. Mont. 1993) (diminishment to debtor's estate with granting of security interest was value of collateral at time of transfer of loan funds).

[10] The date of transfer of the security interest was April 13, 2001.

monthly and every payroll was critical." The bankruptcy court also noted that it was six weeks after the date of transfer that the Debtor filed for Chapter 11 relief on May 29, 2001. On July 25, 2001, the Debtor converted the case to a Chapter 7 bankruptcy proceeding.

Trustee first argues that the business was a going concern given that the machinery and equipment was given and accepted as collateral for the $900,000 Whitney loan, and the liquidation value should not have been used. Alternatively, the Trustee argues that the appraisal liquidation value in the Mallinax Report should have been used given that the forced liquidation did not occur until seven months after the April 13 date of transfer. Specifically, Trustee contends that the Mallinax Appraisal Report, which was submitted on February 15, 2001, should have been used to calculate the value of the collateral because it was the value assigned closer to the April 13, 2001, date of transfer. The report appraised the liquidation value of the collateral at $307,000, and the continued use value at $828,000.

Given that the inquiry as to whether bankruptcy is impending is a question of fact, the Court finds that the bankruptcy court was not clearly erroneous in its finding that Entringer's bankruptcy was clearly imminent and business was "financially dead or mortally wounded."  It is manifest from the testimony of Mr. Leunissen that Entringer could not meet its operational expenses through its revenue and it was extremely undercapitalized. The parties also stipulated that the Debtor was insolvent at the time of the transfer. *See* Joint Pretrial Stipulation, at p. 4. Thus, the bankruptcy court correctly used the liquidation value of the collateral as opposed to its value as a going concern.

The Court further finds that Trustee's contention that the liquidation value in the Mallinax Appraisal Report should have been used instead of the price obtained in a forced sale

of the collateral is without merit. Upon a determination that a debtor is financially dead or mortally wounded, the Fifth Circuit has held that a "scrap" or "junk" liquidation value must be assigned to the collateral in the valuation context. *Langham, Langston & Burnett v. Blanchard*, 246 F.2d 529 (5th Cir. 1957). The Mallinax Appraisal Report gives the price obtainable in an orderly liquidation of the debtor's assets. This is distinguishable from a forced liquidation, in that, an orderly liquidation appraisal predicts the "estimated gross amount the [debtor's] assets should realize if sold piecemeal on a negotiated basis, given a reasonable amount of time in which to find a purchaser." *See* Exhibit 22, Joint Exhibit List. Furthermore, Mr. Timothy Mutz[11] testified at trial "orderly liquidation means that you have funds and time to search out people who may want [to buy the property]." *See* Transcript of Hearing, at p. 196 (Bankr.Rec.Doc.No. 9). The Court acknowledges that there is little, if any, case law suggesting use of the orderly liquidation value or forced liquidation value.

Despite the lack of guiding precedent, the Court interprets "scrap" or "junk" value to mean forced liquidation value in this context. Especially considering that the Debtor was extremely undercapitalized and had little or no positive cash flow at the time of the transfer of the security interest, it is reasonable to conclude that an orderly liquidation could not have taken place. That is, the Debtor was in severe distress and there was neither the financial resources nor the time to conduct an orderly liquidation of the Debtor's assets at the time of the transfer. Thus, the Court finds that the bankruptcy court was correct in using the forced liquidation value in determining the value of the collateral at the time of the transfer.

---

[11] Mr. Mutz was president of the corporation that liquidated by public auction the Debtor's property. *See* Transcript of Hearing, at p. 184 (Bankr.Rec.Doc.No. 9).

First Bank also challenges the bankruptcy court's ruling arguing that though the $74,381.04 liquidation value was correct, the transfer should be ratably avoided only to the extent the debtor's estate was reduced as a result of the earmark to First Bank. In other words, the machinery and equipment in fact was security for the entire $900,000 loan from Whitney, but only approximately $180,000 of the loan was earmarked for First Bank. Thus, the trustee should be able to avoid the diminishment in the Debtor's estate attributable to First Bank, i.e. $15,116.09.

Although there is no case law supporting or rejecting this proration argument, the Court finds that prorating should not apply because the Whitney funds would not have been disbursed, and First Bank would not have received a benefit, if it were not for Entringer granting Whitney a security interest on all of its assets. First Bank, an unsecured creditor, benefitted from the granting of the security interest by being able to avoid participation in the bankruptcy, and the likely substantial reduction in recovery against the Debtor.

## E.      *Ordinary Course of Business Defense*

Prior to the 2005 amendments, the Bankruptcy Code provided that a trustee cannot avoid a transfer if the creditor can show that the transfer was "(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms."[12] *In re Gulf City Seafoods, Inc.*, 296 F.3d 363

(5th Cir. 2002) (*citing* 11 U.S.C. § 547(c)(2). The creditor must show by a preponderance of

evidence that all three statutory elements exist. *Id.*, at 367.

     The Bankruptcy court held that transfer was not in payment for a debt incurred by the

debtor in the ordinary course of business of the debtor and transferee. The court reasoned that

first element was not satisfied finding the following:[13]

> 1.    The First Note was an emergency loan necessary to make payroll and to prevent lessors from commencing eviction proceedings.

> 2.    Repayment of the First Note was clearly not contingent upon earnings from operations as the Debtor did not have positive cash flow at the time; the only rational expectation was that the First Note was to be repaid only by [sic] through closing of the SBA guaranteed Whitney Loan.

> 3.    The First Note was made at a below-prime rate to an undercapitalized entity with little or no cash flow, clearly contrary to the Defendant's loan policy.

> 4.    The Defendant received no collateral for the loan, although there was an intent to take a security interest in Mr. Leunissen's brokerage account. This intent failed as the account was already subject to a prior security interest and the first lienor would not consent to a second position.

*See* Notice of Appeal, Reasons for Decision, at p. 20 (Rec.Doc.No. 1).

---

[12] As Trustee correctly notes, 11 U.S.C. § 547(c)(2) was amended in 2005 with the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act, but the prior version of the statute was in effect at the time of the transfers in dispute. The amendments presumably decrease the creditor's burden by only requiring the creditor to prove the second and third elements of the test as  articulated by *Gulf City Seafoods*.

[13] The parties stipulated that there existed no prior commercial relationship between them.

The Trustee offers evidence supporting the bankruptcy court's findings suggesting that the loan was in fact extraordinary. Specifically, Trustee submits the testimony of Mr. Louis Ballero, the loan officer at First Bank responsible for the loan to Debtor, who testified that First Bank had given the loan as emergency floating capital to prevent lessor eviction and satisfy payroll expenses.

Trustee further submits that the loan was more in the nature of a disguised capital contribution from Mark Leunissen, the primary shareholder in Entringer. Mr. Leunnissen apparently attempted to secure the loan with his personal brokerage account, and even referred to the loan as his personal debt. *See* Appellant's Brief, at p. 14 (Rec.Doc.No. 13). Trustee cites *In re Pioneer Technology, Inc.*, 107 B.R. 698 (9th Cir. BAP 1988), for the proposition that such a disguised capital contribution made to a business that was undercapitalized and had a negative cash flow does not constitute an ordinary business transaction.

First Bank contests the bankruptcy court's third and fourth findings of fact, arguing that the First Bank loan was not contrary to their loan policy and that they in fact had received collateral for the loan to Debtor. First Bank also suggests that as a lending institution often engaged in these types of "bridge loans" the Court should consider the debt was incurred in the ordinary course of business of the debtor and transferee.

In the case of *In re Bourgeois,* 58 B.R. 657, 659 (Bankr. W.D. La.1986), the Honorable Judge Bernard observed:

> The legislative history of section 547(c)(2) states that "[t]he purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." House Report 95-595, 95th Congress, 1st Session (1977), U.S.Code & Admin. News

> 1978, pp. 5787, 6329. Thus, payments made by a debtor to employees, suppliers, for utilities and rent, and other similar operating expenses or trade credit transactions, were intended by Congress to be exempt from recovery as preferences.

While operational expenses are clearly paid in the ordinary course of business, the Court finds that the short term loan obtained by Debtor to meet such obligations cannot be said to occur in the normal course of a operations, especially given that this was the only instance that Debtor obtained a loan from First Bank. *See*, *e.g.*, *Waldschmidt v. Ranier ( In re Fulghum Const. Corp.*), 872 F.2d 739 (6th Cir.1989); *Redmond v. Ellis County Abstract & Title Co. ( In re Liberty Livestock Co.)*, 198 B.R. 365 (Bankr. D. Kan. 1996). Thus, the Court finds that the bankruptcy court was correct in in finding that the loan did not occur in the ordinary course of business. Accordingly,

**IT IS ORDERED** that the bankruptcy court ruling is **AFFIRMED**. For the reasons

assigned above, the Court finds that the transfers made by the Debtor on March 6, 2001, in the

amount of $1,203.00, and on April 12, 2001, in the amount of $181,702.50, can be avoided as a

preferential transfer prohibited by section 547(b) in the amount of $74,381.04. Since First Bank

is the initial transferee, the Trustee can recover these funds from First Bank pursuant to 11

U.S.C. § 550(a).


New Orleans, Louisiana, on this  30th  day of April, 2007.


_____

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**